**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **DOCKET NO.  22-CR-10104-LTS** |
| | ) | |
| **JAMMY ALPHONSE** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Jammy Alphonse submits this sentencing memorandum to urge the Court to sentence him to a prison term of 84 months, followed by three years supervised release. For the reasons that follow Mr. Alphonse asks this Court to vary slightly from the guidelines. Such a sentence is consistent with the factors set forth in 18 U.S.C. § 3553(a) and will result in a sentence that is sufficient, but not greater than necessary, to effectuate the purposes of sentencing. *United States v. Kimbrough*, 128 S.Ct. 558 (2007); *United States v. Booker*, 125 S.Ct. 738 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

I.     HISTORY AND CHARACTERISTICS OF MR. ALPHONSE AND THE NATURE
        AND CIRCUMSTANCES OF THE OFFENSE

*a.  Childhood and Upbringing*

Jammy Alphonse was born on October 14th, 1993, in Cambridge. He was born to a single mother, Suze Montina, who was 21 years old. Ms. Montina was young and had left her partner when she fell pregnant, prepared to embark on her journey as a single mother. She moved in with an older brother, whom she stayed with for the first few years of her son's life. Mr. Alphonse's uncles filled in as father figures when they could, but he knew nothing of his father until he was fourteen. Being Ms. Montina's only child, Mr. Alphonse was naturally protective of her. They lived on her sole income, and their financial hardship was no secret. He refrained from asking for

1

expensive things, like toys, that any child would want. Ms. Montina recounts times when she would take Mr. Alphonse to the shoe store where he would bypass all the Jordans and Nike sneakers that other children his age would obsess over. He would choose the least expensive ones because he knew his mom could not afford the others. The financial hardships Mr. Alphonse experienced from a young age gave him a more mature perspective on money than would be appropriate for a child. When he got his first summer job at fourteen years old, Mr. Alphonse selflessly gave his first check to his mother, a practice he would continue well into adulthood. While Ms. Montina was an excellent parent, her extended family would often verbally abuse Mr. Alphonse, which was a factor in him needing counseling in school. PSR ¶ 91 & 99.

Ms. Montina eventually married and had more children, making Mr. Alphonse the oldest of 4 where he settled into his role as big brother, always caring for his siblings. One of his sisters has special needs and struggles with a seizure disorder, and Mr. Alphonse has always cared for her. The siblings have always felt comfortable going to him for anything they needed. Mr. Alphonse ensures he can be there for his siblings in ways no one could be there for him. He looks for ways to deliver if they need something because he knows what it is like to grow up wanting things and not having access to them. He has always tried to ensure his siblings and son do not experience the same. Mr. Alphonse has also been open with his siblings about his life and many of the poor choices he has made in an effort to prevent them from going down the same path.

Mr. Alphonse's Haitian culture prioritizes respect for elders and maintaining relationships with family. Any relatives who know Mr. Alphonse would describe him as being incredibly respectful and he often tries to bring the family together whenever he can.

### b. Education and Employment

Mr. Alphonse was an honor roll student. He attended Prospect Hill Academy Charter School in Cambridge until he transferred to Somerville High School. While at Somerville High, he was an active member of the football, basketball, and lacrosse teams. After high school, he started trade school at New England Tractor Trailer School (NETTS) in Andover. PSR ¶¶ 105-106. Mr. Alphonse was enrolled in that trade school for a year, studying for his HVAC license, and wants to re-enroll. While incarcerated, he spends his time working out and reading books sent by his partner, Rebekah, to educate himself further.

Mr. Alphonse worked throughout his adolescence at a variety of companies. First as a Valet at Ultimate Parking in Boston, for approximately ten months until he transitioned to work as an Auto Technician at Auto Zone in Everett. He dedicated six months to working at AutoZone. In 2019, Mr. Alphonse started working for FedEx at Logan Airport. While working there, he gained an interest in music production. He started working as a Sound Engineer at i7 Records in Hyde Park, working at both FedEx and i7 records at the same time. He still has a passion for music and plans to return to i7 Records when his sentence is completed.

### c. Children

Mr. Alphonse is the father of Jaxon Alphonse, age six. Jaxon resides in Malden with his mother, Natalya Springer. Prior to his incarceration, he would spend time with Mr. Alphonse at his home in Everett almost daily. The two would bond by taking trips to museums. There was a period when Jaxon moved to Arizona with his mother for two years. Mr. Alphonse visited Jaxon in Arizona more than once a month despite the expense of the travel. When he could not travel to Arizona, he would fly Jaxon and his mother home for a visit. Since his arrest, Mr. Alphonse has kept in touch with his son regularly. The father-son relationship that he and Jaxon have is

affected by his incarceration. Mr. Alphonse plays a massive role in his life, and Jaxon needs his father to be physically present and actively engaged in his life. Mr. Alphonse has always done his best to be in Jaxon's life in a capacity that his own father was not. He understands what it is like to grow up without a father and has always tried to make his presence a big part of his son's life.

    d. *Circumstances of this Offense*

Mr. Alphonse has committed a diverse and large quantity of federal offenses. He is in unusual company, as most individuals do not find themselves in this position. What is a common theme amongst these offenses is that Mr. Alphonse was living a fast life, trying to make easy money and living far beyond his means. There is no doubt that these offenses are connected to the scarcity he experienced as a child. He made money selling drugs, he made money scamming the government out of resources, and he provided a lavish apartment for his friends to crash at. All of this activity has brought to a halt the life young man who had a very bright future and who must now face the very dire consequences of these reckless choices.

II.    THE SENTENCING GUIDELINES & STRUCTURE OF SENTENCE TO BE IMPOSED

*a. Sentencing Guideline Calculation*

The guideline range found by the probation department is incorrect with respect to both the offense level and the criminal history category. We propose the following changes that would result in a guideline range of 70-87 months; with 24 months to run consecutive.

The parties negotiated and agreed to a plea agreement that did not include as part of the loss amount the uncharged conduct of the Paycheck Protection Program, described at ¶ 15. The agreed upon loss amount was therefore between $95,0000 and $150,000 pursuant to U.S.S.G. §

4

2B1.1(b)(1)(E) with a corresponding increase of 8 offense levels. This results in a 9-point difference between Group One (Counts 1&2) and Group Two (Counts 3&4). The plea agreement then incorrectly assigns a 1 level increase as the parties overlooked the 9-point difference that would lead to the additional points not being assigned under U.S.S.G. § 3D1.4(c). As a result, the total adjusted offense level should be 23.

Mr. Alphonse's criminal history score includes four points that we objected to at the first disclosure of the Presentence Report[1]. The probation department accepted our objections, with

---

1 We preserve that objection here: Application Note 12: "In determining whether an unlisted offense is similar to an offense listed in subsection (c)(1) or (c)(2), the court should use a common sense approach that includes consideration of relevant factors such as
    (i)     a comparison of punishment imposed for the listed and unlisted offenses;
    (ii)    the perceived seriousness of the offense as indicated by the level of punishment;
    (iii)   the elements of the offense;
    (iv)   the level of culpability involved; and
    (v)    the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

    Applying this tests to the facts of the convictions at PSR ¶¶ 57, 58, and 64 should move the Court not to score those three convictions. The conviction at ¶ 57 describes an incident of individuals causing a commotion outside a bar. Mr. Alphonse is not described as having engaged in any specific unlawful conduct in the "chaos", yet he was arrested. The punishment was the payment of a $200. fine. Affray is a common law crime but the term is defined in Mass. Gen. Laws ch. 277 § 39: "Fighting together of two or more persons in a public place to the terror of the persons lawfully there." Whether an offense is similar to an enumerated offense in §4A1.2(c)(1) that should not be scored is determined not only by the statutory elements but also "the substance of the underlying state offense." United States v. May, 343 F.3d 1, at 9 (1ˢᵗ Cir.2003), quoting United States v. Unger, 915 F.2d 759 (1ˢᵗ Cir. 1990).

    The facts presented in the PSR describing Mr. Alphonse's presence during a chaotic bar fight, but not necessarily a participant in the fight, closely align with the elements of disturbing the peace or disorderly conduct and should not be scored. U.S.S.G. § 4A1.2(c)(1). Further, we ask the Court to evaluate the conviction at ¶ 64 on two grounds.

    First, the offense of Fleeing an Officer is most similar to Hindering or Failure to Obey a Police Officer and under U.S.S.G. § 4A1.2(c)(1) and should not be scored because he was not sentenced to a term of probation of more than one year. New York P.L. §270.75 states: "A person is guilty of unlawful fleeing a police officer in a motor vehicle in the third degree when, knowing that he or she has been directed to stop his or her motor vehicle by a uniformed police officer or marked police vehicle by the activation of either the lights or the lights and siren of such vehicle, he or she thereafter attempts to flee such officer or such vehicle by driving at speeds which equal or exceed twenty-five miles per hour above the speed limit or engaging in reckless driving…Unlawful fleeing of a police officer in a motor vehicle in the third degree is a class A misdemeanor." Under Massachusetts law; M.G.L. ch. 90 § 25, the offense of Refusal to Submit to a Police Officer is defined as "[a]ny person who, while operating or in charge of a motor vehicle, shall refuse, when requested by a police officer, to give his name and address…or who shall refuse or neglect to stop when signalled to stop by any police officer who is in uniform…shall be punished by a fine of one hundred dollars."

    Second, the court should not consider the one-year conditional discharge to be a 'criminal justice sentence' for purposes of U.S.S.G. § 4A1.1(d). However, the court does not need to reach the question of whether a conditional discharge is a 'criminal justice sentence' if it finds that the conviction at ¶ 64 should not score under §4A1.2(c)(1) as Application Note 4 states that "[f]or purposes of this subsection a "criminal justice sentence" means

one exception – the scoring of the conviction at ¶58, which is called into question by developments in the constitutionality of certain weapons, following the decisions in New York State Rifle and Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022); Caetano v. Massachusetts, 577 U.S. 411 (2016); Ramirez v. Commonwealth, 479 Mass. 331 (2018).

       The conviction at ¶ 58 describes a traffic stop where Mr. Alphonse was found to be in possession of brass knuckles and a spring assisted knife. Following the decisions in Caetano & Bruen, the weapons that Mr. Alphonse was alleged to have carried are protected under the 2nd Amendment. A conviction that cannot sustain constitutional scrutiny should not be scored. New York State Rifle and Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022); Caetano v. Massachusetts, 577 U.S. 411 (2016); Ramirez v. Commonwealth, 479 Mass. 331 (2018) In the aftermath of these Supreme Court cases, it is clear that M.G.L. c. 269 § 10(b) is unconstitutional, because it bans whole categories of weapons that law-abiding citizens might elect to carry for purposes of self-defense. Thus, it is entirely consistent with the spirit of the Second Amendment. It is beyond dispute that the Second Amendment applies to all weapons, not just guns: "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding[.]" Caetano v. Massachusetts, 577 U.S. 411, 411 (2016).

---

a sentence countable under §4A1.2…" Put simply – if the conviction doesn't score the question of whether the conditional discharge is a criminal justice sentence is moot.

While the broad protection of an individual right to possess and carry "arms" is not unlimited under <u>Heller</u>, the Supreme Court in <u>Caetano v. Massachusetts</u> unanimously reversed the Supreme Judicial Court's decision to uphold a categorical ban on certain weapons (stun guns) and rejected the Supreme Judicial Court's interpretation of the Second Amendment as far too narrow. <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008).

Mr. Alphonse resolved the case at ¶ 58 before any of the cases cited were decided. Despite the conviction at ¶58 being his second adult offense, and having no juvenile record whatsoever, for him to receive a guilty finding on that (and the conviction at ¶ 57) begs the question of the degree of zealous representation he received. We do not dispute that Mr. Alphonse did in fact resolve this case in the manner in which the PSR suggests he did; rather because of all of these factors we ask the Court to treat this conviction with significant scrutiny and consider not scoring it or varying downward.

Finally, we ask that the Court consider whether these combined concerns regarding Mr. Alphonse's criminal history score warrant a variance under § 4A1.3(b)(1) as in the aggregate they create a reliable record that Mr. Alphonse's criminal history category substantially over-represents the seriousness of his criminal history.

With these two adjustments – an offense level of 23 and a criminal history category of IV, the guideline range would be 70-87 months; with 24 months for the Aggravated Identity Theft to run consecutive.

### b.  Structure of the Sentence to be Imposed

We ask that the Court structure the sentence so that Mr. Alphonse is sentenced to a term of imprisonment of 60 months on counts 1, 2, 4, and 5, to be served concurrently with one another, concurrently with the as yet to be imposed state court sentences at ¶¶ 69-74 and a

sentence of 24 months on count 3 (Aggravated Identity Theft) to be served consecutively to the sentence imposed on the previous counts.2

### c. Sentence May Be Concurrent

U.S.S.G. § 5G1.3(d)(Policy Statement) makes clear that the Court has the authority to impose a federal sentence concurrent to an undischarged term of imprisonment when that would achieve a "reasonable punishment" for the instant offense.

Applying the "reasonable punishment" standard to this offense, and taking into consideration the totality of the circumstances, it would be appropriate for the Court to impose this sentence concurrent to the 9-year sentence that will be imposed in the state court.

## III.    A JUST SENTENCE

Pursuant to 18 U.S.C. §3553(a)(2), the court must consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Put simply, these four purposes of sentencing are punishment, deterrence, incapacitation, and rehabilitation.

There is no doubt that Mr. Alphonse deserves to be punished for his conduct. His actions have had a negative consequence on his community, on individuals who rely on government assistance during the pandemic, and the victims who had their identities used. During the time that Mr. Alphonse has been detained he has been able to reflect on how his actions affect others, including the long-term consequences for people who have had their identities used.

---

2 Mr. Alphonse is scheduled to appear in the Dorchester District Court on September 23rd, the Suffolk Superior Court on September 26th, and the Chelsea District Court on September 27th.

The requested sentence will also serve as an adequate deterrent to Mr. Alphonse. He has had to remain in jail during this unprecedented pandemic. He knows if he re-offends, he will go back there, and for a much longer period of time at that. Mr. Alphonse also has previously a very limited record. This spree of offenses has earned him a high guideline range and a definite term of imprisonment of at least 84 months.

For many BOP institutions, and the Plymouth County Correctional Facility where Mr. Alphonse has been detained, pre-trial detention over the last two years has been especially difficult, with limited access to family visits or programming and tremendous time spent in near 24-hour lockdown.  Cell confinement and shut down of visits and programming has been the primary method of preventing a COVID-19 outbreak at these facilities. As social distancing is not possible or tenable in correctional facilities, many jails have imposed prolonged cell confinement measures, requiring prisoners to remain locked separately in their own cells to eliminate access to places where prisoners congregate (e.g. gyms, recreational areas, dining halls, etc.). Prolonged cell confinement has been deemed by the Supreme Judicial Court of Massachusetts, after reviewing expert testimony on the matter, to be "highly toxic to psychological functioning" and can cause prisoners to "develop severe perceptual disturbances, including perceptual distortions and overt hallucinations." *Haverty v. Comm'r of Correction*, 437 Mass. 737, 752 (2002). While this may be necessary, the Court must also see the psychological impact it has on the people sentenced or detained during this unprecedented pandemic and take that into account when imposing a fair sentence. In terms of general deterrence, the recommended sentence shows others in the community that while the Court can show compassion for the safety of a defendant during COVID-19, the pandemic is not simply a "get out of jail free" card for defendants.

The final two purposes of sentencing – incapacitation and rehabilitation – will also be served by the requested sentence. Whatever danger to the community Mr. Alphonse posed has been diminished. He has been removed from society and will continue to be incarcerated.

## **CONCLUSION**

For these reasons, Jammy Alphonse asks that he be sentenced to a prison term of 84 months, to be served concurrent to his other open matters, with three years of supervised release to follow.

JAMMY ALPHONSE
By his attorney,

*/s/ Jessica P. Thrall*
Jessica P. Thrall, BBO #670412
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 9, 2022.

*/s/ Jessica P. Thrall*
Jessica P. Thrall